UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KENYA ADAMS-MARTIN,                       :
     Plaintiff,                          :
                                         :
v.                                        :        CIVIL ACTION NO.
                                         :        3:10-cv-00099 (VLB)
CONNECTICUT DEPARTMENT OF                 :
DEVELOPMENTAL SERVICES,                   :
     Defendant.                          :        March 14, 2012

MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [Dkt. #43]

Plaintiff, Kenya Adams-Martin ("Plaintiff") brings this suit against her employer, the Connecticut Department of Developmental Services ("DDS" or "Defendant"). In Count I, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq, the Plaintiff alleges that the Defendant created a hostile work environment by harassing and discriminating against her on the basis of her race and color, and that the Defendant has created a hostile work environment. In Count II, Plaintiff alleges a claim for intentional infliction of emotional distress. Currently pending before the Court is Defendant DDS's motion for summary judgment as to Plaintiff's complaint in its entirety.

I.     Factual Background

The facts of this case are largely undisputed.  The Plaintiff admits most of the statements contained in Defendants Rule 56(a)(1) statement. [Dkt. #43, Ex. 1]. In those instances where she denies the statements asserted by the Defendants, her denial is recited herein. The sole remaining question is whether or not these

1

facts constitute (1) a violation of Title VII, and (2) constitute the intentional infliction of emotional distress. Accordingly, the following facts, unless otherwise noted, are undisputed.

The Plaintiff is an African American female employed by Defendant DDS, an agency of the State of Connecticut within the meaning of C.G.S. 17a-210 et seq. [Dkt. #43-1, Def. Rule 56 Stmt. ¶¶ 1,8]. The Plaintiff was hired in 1987 as a Developmental Services Worker 1 ("DSW1"), and was promoted in 1989 to her current position as a Developmental Services Worker 2 ("DSW2"). [*Id.* at ¶ 8]. Except for a one-year period during which her employment was terminated, the Plaintiff worked at the DDS facility located on Wintergreen Avenue in Hamden, until the facility closed in 2009. [*Id.*].  Throughout her employment, Plaintiff has been a member of the bargaining unit covered by the contract between the State of Connecticut and the New England Health Care Employees Union, District 1199 ("Union"). [*Id.* at ¶ 12].

A.  The "MD" Incidents

Prior to her termination in 2006, Plaintiff was involved in two incidents concerning a client identified as "MD," who had a condition requiring that his food be ground or finely chopped. The first incident occurred in 2002. [Dkt. #43-1, Def. Rule 56 Stmt. at ¶ 15]. The Plaintiff and another DDS employee, Granger, who is an African American male, were responsible for preparing MD's food. [*Id.* at ¶¶ 13, 16]. MD consumed meat that contained a bone, which became lodged in his throat, requiring him to be hospitalized for choking. [*Id.* at ¶ 16]. A subsequent investigation found neglect on the part of the Plaintiff and Granger, and the two

were suspended for five days. [*Id.* at ¶ 16]. However, an arbitrator reviewed the suspension and determined that it was not for cause, and ordered that the discipline be expunged from the employees' records. [Dkt. #56-1, Pl. 56 Stmt. ¶ 16]. After the incident, the DDS Occupational Therapy staff changed the requirements for MD's food consistency, and the Plaintiff and Granger were informed of this change. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 16].

The second incident occurred in 2006, when the Plaintiff, Granger, and Greene (an African-American DDS employee) were responsible for preparing MD's food. [*Id.* at ¶¶ 14, 17]. During their shift, MD obtained and consumed a portion of spaghetti with whole meatballs. [*Id.* at ¶ 17]. One of the meatballs became lodged in his throat, and he ultimately choked to death. [*Id.*]. All three employees were placed on administrative leave pending an investigation. The investigation revealed neglect on their part and all three employees were terminated on December 22, 2006. [*Id.*]. The three employees subsequently grieved their termination, and on November 15, 2007, an arbitrator issued an award directing DDS to reinstate them and make them whole except for a thirty-day disciplinary suspension. [*Id.* at ¶ 18].

B.  The December 7th, 2007 In-Service Training

Following their reinstatement, the Plaintiff, Granger, and Greene returned to their prior positions at the Wintergreen Avenue facility, and were sent to New Employee Training. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 19]. DDS policy requires that all new employees attend training, including dysphagia (choking) training, within 30 days of employment. [*Id.* at ¶ 20]. DDS policy also requires that employees

3

returning after approximately one-year absences undergo retraining, known as "in-service" training. [*Id.*].  A dysphagia retraining for Plaintiff, Granger, and Green related to dysphagia in general, and the specific needs of the DDS' clients residing at the Wintergreen Avenue facility for whom they were responsible was scheduled for December 7, 2007. [*Id.* at ¶22].

Plaintiff denies that three employees were scheduled for an in-service training on December 7, 2007, but asserts that she received a phone call on December 7 asking her to come in at 1:00pm to read and go over paperwork, and neither Granger nor Greene were present. [Dkt. #56-1, Pl. 56 Stmt. ¶22]. Defendant DDS asserts that Plaintiff did in fact attend an in-service training on December 7, 2007 related to the specific needs of six DDS clients at the Wintergreen Avenue facility along with two other DDS employees, Ms. Brown and Ms. Miles. [Dkt#43-1, Def. Rule 56 Stmt. ¶23]. Plaintiff denies that Brown and Miles participated in the in-service training on December 7, 2007. [Dkt. #56-1, Pl. 56 Stmt. ¶23]. She claims that these two employees were present only because it was their shift to work, and she was the only one required to participate in the training. [*Id.*].

Defendant DDS asserts that Granger and Green, although originally scheduled to attend, were ultimately unable to attend as Granger was out on worker's compensation and Green had scheduling conflicts with his private sector employer. [*Id.* at ¶26].  As a result of these conflicts, Defendant reports that Granger and Green received the same in-service training on February 28, 2008. [*Id.* at ¶27]. Plaintiff admits that she is not aware of whether Granger and Green

were treated similarly to her following their reinstatement. [Dkt. #47-1, Pl's. Dep., 247:9-13].

### C.  The December 12th, 2007 Training

Defendants contend that a dysphagia training was scheduled for December 12, 2007, but, due to low registration, the training was cancelled. [Dkt. #43-1, Def. Rule 56 Stmt.¶28]. Defendants further contend that because Plaintiff was a late add-on to the training and was not included on the class roster, she was not notified of the cancellation by the training center. [*Id.*]. Plaintiff denies that a dysphagia training was scheduled for December 12, 2007, asserting that she was instructed to attend a training session as a ruse to harass her.

When she arrived in New Haven, two of the Defendant's employees informed her that there was no training scheduled. [Dkt. #56-1, Pl. 56 Stmt. ¶28]. Plaintiff asserts that the usual way to inform employees of a change in training programs was to inform the supervisor through email, who in turn would inform the employees. Plaintiff asserts that her supervisor never informed her of the cancellation. [*Id.*] Further, Plaintiff alleges that the Defendant initially claimed that the training was cancelled due to inclement weather and has since altered its explanation to suggest that the training was cancelled due to low registration. [*Id.*]. Although Plaintiff admits that the program supervisor could tell her which trainings to attend, Plaintiff contends that the program supervisor discriminated against her based on her race and color by telling her to attend a training when none was scheduled thus contributing to the creation of a hostile work environment. [Dkt. #43-1, Def. Rule 56 Stmt. ¶29].

5

### D.  Policy Regarding Meat with Bones

In the summer of 2008, Plaintiff alleges that she was harassed by Carmen Douglas, a Hispanic man and one of Plaintiff's supervisors, who chastised her for violating a non-existent policy by purchasing meat with bones. [Pl. Depo., Exh. A, 94:12–25, 96:3–25, 97:1-9]. Plaintiff claims that Bernard McNair, a Developmental Services Residential Program Supervisor 1 ("DSRPS1") and an African American male, called Plaintiff later and told her that Douglas did not know that the home doesn't purchase meat with bones in it, and that he would inform her about it. *Id.* at 97:3–18; [Dkt. #56-1, Pl. 56 Stmt. ¶ 49]; [Dkt. #60 Def.'s Supp. 56 Stmt. ¶¶ 92–93 (providing general information about McNair)].

There was no DDS policy regarding the purchase of boneless meat, although many group homes, for safety reasons, preferred to purchase boneless meat. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 49]. In its supplemental statement, Defendant DDS claims that Plaintiff called McNair excited over the incident involving Douglas, and that McNair explained that there was no policy regarding boneless meat, but that he would speak to Douglas. [Dkt. #60 Def.'s Supp. 56 Stmt. ¶ 105]. At the time of the incident, Douglas was a relatively new supervisor. [Pl. Depo., Exh. A, 97: 19–22].

### E.  The Timesheet Incident

Plaintiff claims she was falsely accused of timesheet fraud and that the Defendant's investigation of the incident was aberrant. As a union delegate, Plaintiff was entitled to attend contract negotiations during regular work hours while being paid by DDS. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 35]. Plaintiff submitted a

timesheet stating that she was at a contract negotiations meeting on November 13, 2008. [*Id.*].  However, the Defendant claimed that her name was not listed on the sign-in sheet Union officials gave to Mr. Gerald Daley ("Daley"), the DDS Agency Personnel Director. [*Id.*].  Plaintiff contends that her name was on the sign-in sheet originally, and appears to infer that since her name was subsequently not on the sheet, her name was somehow removed. [Dkt. #56-1, Pl. 56 Stmt. ¶ 35]; [Pl. Depo., Exh. A, 274: 19–23.]

On or about November 14, 2008, Carl Richetelle, DDS Regional Residential Manager, became aware of the alleged discrepancy in Plaintiff's timesheet, and sent her letter on December 2, 2008 requesting she attend a "fact-finding meeting" on December 8, 2008. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 33]; [Richetelle Aff., Exh. B., Attach. 10 (letter from Richetelle dated 12-2-08)]. At the fact finding conducted by Ms. Green, Plaintiff appeared with Union representation and indicated she had attended the November 13 negotiations and had signed the sign-in sheet. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 36]. After the December 8th meeting, and on request, the Union sent DDS a new sign-in sheet that contained Plaintiff's signature as the last name on the sign-in sheet indicating that Plaintiff signed in at 9:30 am, following two signatures of employees who signed in at 10:00 am. [*Id.* at ¶ 37]. DDS then sent Plaintiff a follow-up letter indicating the allegation that the Plaintiff misrepresented her time sheets was unsubstantiated. [Green Aff. Exh. D, Attach. 11]. Plaintiff's payroll was adjusted accordingly and no disciplinary action was instituted. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 37].

Plaintiff does not dispute these facts, however Plaintiff argues that the facts constituted harassment and asserts that the incident should be characterized as the Defendant having accused her of payroll fraud. [Dkt. #56-1, Pl. 56 Stmt. ¶33]. Plaintiff contends that the Defendant acted in bad faith because it treated another employee with a timesheet discrepancy differently from Plaintiff, and because it departed from its past practice of calling Plaintiff first in order to clarify any questions regarding her attendance at a meeting or in-service before initiating a formal fact-finding hearing or disciplinary proceeding. [Dkt. #56-1, Pl. 56 Stmt. ¶ 40]. Plaintiff has introduced no DSS policy or other evidence prescribing the manner in which such matters were routinely handled nor does she state which supervisors handled the incidents or any particulars of the incidents or the alleged offenders.

Defendant admits that the other employee had a similar payroll issue to that of Plaintiff. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 39].  However, Defendant asserts that both discrepancies were investigated. [*Id.*]. Given that all timesheets must be countersigned by supervisors and rechecked by payroll officers, the Defendant asserts that its actions were necessary to clarify any discrepancies, and that it pursued the payroll fraud allegations in good faith given the information available to it at the time. [*Id.* at ¶ 40]. Defendant does not claim that every official (or supervisor) handled discrepancies in the same manner.

### F.  The Alleged Work Rules Violation Incident

Plaintiff contends that she was falsely accused of a work rules violation. This incident arose out of an alleged complaint from a client's family member

regarding a violation of DDS work rules by Plaintiff. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 41].  Plaintiff asserts that she was accused violating the rule against contacting a parent by contacting a parent of a client at the 508 Wintergreen Home "and telling that parent that don't get involved with the group home not closing." [Dkt. #47, Dep. of Kenya Adams Martin, 159:13-17]. The Defendant claims it became aware of such complaint, and that it therefore had to investigate the allegation, as it does for all DDS employees. [*Id.*].

On May 18, 2009, there was an "investigatory meeting" where Richetelle and Green spoke to Plaintiff and determined the allegation was not substantiated, and subsequently sent Plaintiff a letter confirming that finding. [*Id.*]; [Richetelle Aff., Exh. B, Attach. 13]. The Plaintiff maintains that DDS was acting in bad faith in accusing her of the violation given that, as she alleges in her deposition testimony, Green was unable to identify any parent having reported such a violation on behalf of the Plaintiff. [Pl. Depo., Exh. A 160: 13–23]. Plaintiff therefore "guess[ed]" that no parent made such an allegation. [*Id.* at 160: 21–23].

### G. Inspection Incidents

Plaintiff claims she was subjected to surveillance to which others were not subject. Under Richetelle's supervision, DDS employee Malcolm Brinton ("Brinton") conducted periodic inspections on various group homes to ensure that programs and practices were being implemented properly. [Dkt. #43-1, Def. Rule 56 Stmt. ¶¶ 46–47]. On each visit, Brinton used a check-off form that listed the names of staff on duty during the inspection. [*Id.* at ¶ 47]. Of the seven reports regarding the Wintergreen Avenue location, Plaintiff's name only appears on

three. [*Id.*] Brinton contends that monitoring was not done on any particular
schedule, and that no specific staff person was the object of his observations.
[*Id.]* However, Defendant DDS notes that Brinton would generally make his visits
during the second shift since most clients were home from their day programs on
this shift. [Dkt. #60 Def.'s Supp. 56 Stmt. ¶ 89].

### H.  Alleged Harassing Comments

Plaintiff claims she was falsely accused of misconduct on February 28,
2008, when Worsley, an Occupational Therapist Supervisor at DDS, noticed a
client whom she knew required line-of-sight supervision enter the kitchen and
attempt to lift the lid to a boiling pot of food. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 48].
Plaintiff claims Worsley, in the presence of Plaintiff's coworkers, asked Plaintiff
who was the charge person was and accused Plaintiff of leaving a pot of bones
on the stove. [Dkt. #56-1, Pl. 56 Stmt. ¶ 48]. Worsley alleges that she called out
asking who was responsible for the unattended client, and denies shouting at
anyone or making harassing comments regarding Plaintiff cooking the clients'
meals with bones. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 48].

### I.  Alleged Comments by D'Haiti

Plaintiff claims she was the target of harassment by McNair. In particular,
Plaintiff alleges that fellow employee Pierre D'Haiti ("D'Haiti), an African American
male of Haitian ancestry, informed her that McNair, Residential Program
Supervisor, told D'Haiti and other employees to make Plaintiff's "life as miserable
and … as hard as possible, [and] to do anything [they] could to upset [her] shift,
to upset [her]." [Pl. Depo., Exh. A 123: 8–22]. However, D'Haiti denied that such

statements were made. [Dkt. #60 Def.'s Supp. 56 Stmt. ¶ 82]. Plaintiff has not identified any other person who allegedly heard the remark.

### J.  Incidents At Other Homes

Although Plaintiff admits that there were no other DDS employees of other colors and races whose clients choked to death while under their supervision, she summarily claims that there were DDS employees of other races who were nonetheless similarly situated to her, and yet treated more favorably. [Dkt. #43-1, Def. Rule 56 Stmt. ¶¶ 51, 55–58].

Plaintiff asserts that Justin Baldino ("Baldino"), Keith Sylvester ("Sylvester"), and Eric Finilli ("Finilli") are Caucasian employees who worked at DDS's transitional unit on Undercliff Road in Meriden. [Dkt. #43-1, Def. Rule 56 Stmt. ¶¶ 51, 53]. On January 1, 2006, a client for whom these employees were responsible died of a heart attack as a result of a certain medical condition. [*Id.* at ¶¶ 52, 53]. The death was investigated by an independent state agency known as the Office of Protection and Advocacy for Individuals with Disabilities. [*Id.* at ¶ 53].The agency found no evidence of abuse or neglect on the part of the employees, and no disciplinary action was taken. [*Id.*].  Since the death occurred at a state facility, the state police also conducted an investigation. [*Id.*].

According to Plaintiff, the Meriden employees were similarly situated to her, yet unlike Plaintiff, they were not disciplined for their client's death. [*Id.* at  ¶ 51]. Plaintiff appears to assert that these employees were similarly situated to her because a client for whom they were responsible for died while under their supervision and because their employment responsibilities were essentially the

same as hers. [*Id.* at ¶ 51; [Dkt. #56-1, Pl. 56 Stmt. ¶ 54]. Plaintiff notes that Baldino, Sylvester, and Finilli were either DSW1 or DSW2 workers, and that the only difference between the positions was that DSW2 workers take additional phone calls and fill out additional paper work. [Dkt. #56-1, Pl. 56 Stmt. ¶ 54].

However, Plaintiff did not have firsthand knowledge of the circumstances of the Meriden client's death. [Dkt. #43-1 Def. Rule 56 Stmt. ¶52]. She did not know if the allegations of neglect against the Meriden employees were found to be unsubstantiated (though she admitted that she, Greene, and Granger were found to have been neglectful), and she did not know that the client actually died of a heart attack. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 52]. Plaintiff knew that the client's death was termed accidental, and that the client was restrained by staff just prior to his death. [Dkt. #56-1, Pl. 56 Stmt. ¶ 52].

Plaintiff claims there was another incident where similarly situated Caucasian employees were not disciplined. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 55]. According to Plaintiff, a DDS client at the group home on Totocket Road in North Branford choked on bones and was then hospitalized, yet the employees responsible for the client, unlike Plaintiff, were not disciplined. [*Id.*]. Other than the client's initials ("KG"), Plaintiff does not present any further information about the incident. [Dkt. #56-1, Pl. 56 Stmt. ¶ 55]. The Defendant indicates the North Branford facility was under Richetelle's supervision at various times, but he is unaware of the incident, and with Plaintiff being unable to identify the client further, DDS is unable to investigate whether or not the incident occurred. [Dkt.

#43-1, Def. Rule 56 Stmt. ¶ 55]. Plaintiff failed to provide any additional evidence to support this claim. [*Id.*].

Plaintiff also claims that an employee at the North High Street facility, whom she identified as "Bill," was not disciplined even though for an entire day, on an unspecified date, he did not give medications to the clients for whom he was responsible.  [*Id.* at ¶ 57]. However, because the allegation is vague, Richetelle is unaware of this incident and DDS is unable to investigate whether or not this occurred. [*Id.*]. Plaintiff has failed to provide any additional evidence to support this claim. [*Id.*].

Plaintiff identifies Victoria Hayes ("Hayes") as another individual similarly situated to Plaintiff. In support of this characterization Plaintiff states summarily that they both worked at the Wintergreen Avenue location and had the same supervisor, Mason, a Black female. [Dkt. #43-1, Def. Rule. 56 Stmt. ¶ 58]. However, Plaintiff and Hayes work on different shifts. [*Id.*]. Plaintiff alleges that Hayes received more favorable treatment after she was not disciplined for allegedly giving out wrong medications to a client. [*Id.*] Richetelle is aware that Hayes is Caucasian, and that she worked at Wintergreen Avenue, and reports, to the best of his knowledge, that Hayes has undergone counseling for errors in giving out medications, as reflected in her yearly performance reviews. [*Id.*]. Plaintiff has no first-hand knowledge of whether Hayes was disciplined, and admits that she has not reviewed Hayes's file. [*Id.*].

In general, Defendant DDS claims it has no knowledge of anyone harassing, discriminating, retaliating, or intimidating the Plaintiff or creating a

hostile work environment for her after her reinstatement or at any other time during her employment. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 30]. DDS is not aware of Plaintiff filing any internal complaints regarding harassment, hostile work environment or discrimination prior to filing her CHRO complaint. [*Id.* at ¶ 60]. Further, Defendant points out that the Plaintiff had received "good" performance on each of her Performance Appraisals from September 2007, 2008, and 2009, and that based on her appraisals, and in accordance with the Collective Bargaining Agreement ("CBA") between the State and the Union, she received all raises to which she was entitled. [Dkt. #60 Def.'s Supp. 56 Stmt. ¶¶ 85–86]. Plaintiff received raises in 2007, 2008, and 2011. [*Id.* at ¶ 87].

Additionally, Defendant DDS points out that DDS Human Resources is not aware of any complaints by Plaintiff alleging such conduct by the Defendant. [*Id.* at ¶ 50]. Green's office usually receives such complaints, and the only complaint by Plaintiff of which Green is aware is the November 3, 2008 complaint filed by Plaintiff with the CHRO, which Plaintiff admits does not raise a claim based on national origin, and the present suit. [*Id.* at ¶¶ 50, 69]. However, the Plaintiff claims that she filed grievances with the state regarding the treatment she received after her reinstatement related to the December 7th and December 12th 2007 trainings. [Dkt. #56-1, Pl. 56 Stmt. ¶ 30].

Although the Plaintiff cannot deny that no disciplinary actions were taken against her since her reinstatement, [*Id.* at ¶¶ 42–44], she argues that the letters accusing her of payroll fraud and the allegations of work rule violations have become part of her employment file, and could therefore hinder her chances for

promotion although the payroll fraud investigation ended in her exoneration and she did not introduce her employment file and thus there are no derogatory employment file entries in the record. [Dkt. #56-1, Pl. 56 Stmt. ¶ 42]. However, the Defendant does not deny that reports of some incidents are in her file.

## II.     Standard of Review

"Summary judgment should be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' [Fed.R.Civ.P. 56(a)]. The moving party bears the burden of proving that no factual issues exist. [*Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010)]. 'In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.' [*Id.,* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))]. 'If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied.' [*Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted)]. In addition, '[a] party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding,

Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.' [*Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09civ1341(VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011)]. Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

III.     Discussion

A.  Title VII Disparate Treatment Claim

"Under Title VII, Plaintiff's claims of discriminatory treatment are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). The *McDonnell Douglas* standard requires that Plaintiff establish a *prima facie* case of discrimination by showing that (1) she is part of a protected class; (2) that she was qualified for her position; (3) that she suffered an adverse employment action and (4) that the circumstances surrounding the employment action give rise to an inference of discrimination. *Id.* The Second Circuit has noted that the burden to establish a prim facie case is 'minimal' or 'de minimis.' *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir.2005).

"If Plaintiff can establish a *prima facie* case, the burden shifts to the Defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell,* 411 U.S. at 802. As this stage, Defendants need only proffer, not prove, the existence of a nondiscriminatory reason for their employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254–55, (1981). "This burden is one of production, not persuasion, it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097 (2000) (internal quotations omitted).

"If Defendant meets its burden of production, the burden shifts back to Plaintiff to show that the legitimate, nondiscriminatory reason offered by the Defendant is mere pretext for illegal employment discrimination. *McDonnell,* 411 U.S. at 804. "Although the intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves,* 530 U.S. at 143.

### B.  Membership in Protected Class and Qualification for Position

The parties agree that Plaintiff satisfies prongs (1) and (2) of her prima facie case. The Plaintiff is African-American, and is therefore a member of a protected class, and the Defendant does not claim Plaintiff was unqualified for her position. [Dkt. # 46, Mem. in Support of Def.'s Motion for Summary Judgment at 16, 20]; [Dkt. # 57 Mem. in Support of Pl.'s Objection to Def.'s Motion for Summary Judgment at 7–8].

### C.  Adverse Employment Action

The Plaintiff contends that her subjection to fact-finding meetings and the placement of memos in her employment file accusing her of payroll fraud and DDS rule violations constitute adverse employment actions as they may hinder her chances for promotion. [Dkt. # 57 Memorandum of Law in Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment at 8]; [Dkt. #56-1, Pl. 56 Stmt. ¶ 41–42].  Although Plaintiff admitted in her 26(a)(2) Statement that only one document was in fact placed in her employment file, in her deposition, Plaintiff states that she "was told that [the letters] were going into [her personnel] file," but that she did not know if they were in her permanent file. [Dkt. #47-1, Pl. Dep. 311:1-12]. Defendant does not contest that the memos were placed in Plaintiff's file.

The Defendant contends that Plaintiff has not suffered an adverse employment action, emphasizing that Plaintiff admits she has not been disciplined since her reinstatement.  Rather, the Defendant points out that the Plaintiff has not applied for a promotion, that she has received "Good" performance evaluations since her reinstatement, and that she has received all raises to which she was entitled.

An adverse employment action is a "materially adverse change in the terms and conditions of employment," such as termination, demotion, material loss of benefits, and significantly reduced job responsibilities. *Gibson v. State of Connecticut Judicial Dep't Court Support Services Div.,* No. 3:05-cv-1396 (JCH), 2007 WL 1238026 at *4 (D.Conn. April 25, 2007) (citing *Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006)). "Reprimands, threats of disciplinary action and

excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." *Abraham v. Potter*, 494 F. Supp. 2d 141, 148 (D. Conn. 2007). Therefore, allegedly unfair or excessive monitoring, even when accompanied by verbal reprimands, is not an adverse employment action without accompanying negative results. *Bennet v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 248 (S.D.N.Y. 2001) (holding that no adverse employment action occurred where plaintiff was unfairly scrutinized and reprimanded for tardiness, when monitoring and reprimands did not result in decrease in pay, probation, or other negative consequence). In addition, being required to attend disciplinary meetings with supervisors, in the absence of any tangible consequence, does not constitute an adverse employment action. *Gear v. Department of Education*, No. 07 Civ. 11102 (NRB), 2011 WL 1362093 at *3 (SDNY 2011) (holding that plaintiff's being summoned to disciplinary hearings with supervisors, being required to ask permission to leave classroom, being laterally transferred to different classrooms, and working with teachers with whom she had interpersonal conflicts did not materially change the terms and conditions of her employment).

Negative evaluations, without tangible consequences on employment conditions, such as demotion, suspension, or loss of wages, are not adverse employment actions. *See Valentine v. Standard & Poor's*, 50 F.Supp.2d 262 (S.D.N.Y. 1999), aff'd 205 F.3d. 1327 (2d. Cir. 2000) (holding that negative performance reviews, without evidence of negative consequences flowing from such reviews, are not adverse employment actions); *see also Bennet v. Watson*

*Wyatt & Co.*, 136 F.Supp.2d 236 (S.D.N.Y. 2001) ("Courts have held that negative evaluations, standing alone without any accompanying adverse results, are not cognizable."). The court in *Valentine* described the necessary harmful consequences as "immediate," stating that since "plaintiff's negative reviews did not lead to any *immediate* tangible harm or consequences, they do not constitute adverse actions materially altering the conditions of his employment." *Valentine,* 50 F.Supp.2d at 284 (emphasis added).

Additionally, the Second Circuit has held that disciplinary notices do not constitute adverse employment actions without accompanying consequences to the employee's working conditions. In *Weeks v. New York State (Div. of Parole),* 273 F.3d 76, 86 (2d Cir.2001), the court held that a "notice of discipline" for misconduct and incompetence did not create a material change in the plaintiff's employment conditions. The court emphasized that the plaintiff "[did] not describe [the notice's] effect or ramifications, how or why the effect would be serious, whether it went into any file, or even whether it was in writing." [*Id.*].

At first glance, the language in Weeks could be read to suggest that if the plaintiff had shown the notice was in writing and placed in her file, it might have constituted an adverse employment action. Yet, several district courts within the Second Circuit have held that disciplinary letters or written reprimands, even when placed in an employee's personnel file, are not adverse employment actions absent some present, tangible effect on the employee's terms of employment. *See Cristofaro v. Lake Shore Central School District*, No. 06-CV-0487S, 2011 WL 635263 at *10 (W.D.N.Y. Feb. 11, 2011) ("[c]ourts have held that

disciplinary write-ups, whether placed in a personnel file or not, which are not accompanied by any adverse change in the terms and conditions of her employment do not amount to an adverse employment action"); *Shabat v. Blue Cross Blue Shield of Rochester*, 925 F. Supp. 977, 989 (W.D.N.Y. 1996) (holding that placement of reports in plaintiff's personnel file was too inconsequential to constitute an adverse employment action given that plaintiff was never demoted, or denied pay or benefits because of the reports); *O'Hazo v. Bristol-Burlington Health District*, 599 F.Supp.2d. 242, 248, 258 (D. Conn. 2009) (written reprimand for failure to check shipment list regarding shellfish, which resulted in a patron becoming sick after consuming shellfish, was not an adverse employment action without a showing that the reprimand changed the terms or conditions of plaintiff's employment).

In *Henton v. City of New London*, No. 3:06 CV 2035(EBB), 2008 WL 2185933 at *12 (D. Conn. May 23, 2008), the court held that even the combination of being approached for tardiness, being subjected to a disciplinary hearing, and receiving a written reprimand, all within the same month, was not enough to constitute adverse employment action. The Plaintiff had not shown that these actions had changed the terms of his employment. Although he alleged such actions "created serious doubt as to his future with the defendant," he had not presented evidence supporting his claim that these actions put his position in jeopardy. [*Id.* (internal quotes omitted).

There are, however, some district court cases that appear to hold that disciplinary letters in an employee's file may constitute adverse employment

actions in light of their effect on the employee's future job prospects. In *Punsal v. Mount Sinai Services of Mount Sinai School of Medicine of New York*, No. 01Civ.5410(CBM), 2004 WL 736892 at *9 (S.D.N.Y. Apr. 6, 2004), the court held that two memoranda, one alleging that plaintiff failed to inform her superior that a newly hired employee did not report to work, and another ordering her to discontinue lunch overtime constituted adverse employment actions. The court noted that the letters would likely become part of plaintiff's employment file, and because they could hurt her chances for future employment, they constituted adverse employment actions. *Id.* at *9.  Although the plaintiff alleged discrimination claims under the Age Discrimination in Employment Act ("ADEA"), ADEA claims are analyzed under the McDonnell Douglas framework used for Title VII race discrimination claims and the cases the court cites as support for its holding are Title VII retaliation cases. *See id.* at 7, 9; *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 464 (2d. Cir. 1997) ("We approach Wanamaker's age-based retaliatory discharge claim in the same way as retaliation claims under Title VII of the Civil Rights Act of 1964").

Although Title VII retaliation claims and disparate treatment claims both require a plaintiff to suffer adverse employment action, the Supreme Court has broadened the scope of what constitutes adverse employment action for retaliation claims. *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 2405 (2006); *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (holding that suspension, investigation, reinstatement and post-disciplinary process reassignment of employee could constitute deterrence to engage in protected

activity thus constituting an adverse employment action). Unlike plaintiffs in Title VII discrimination claims, plaintiffs in retaliation claims need not show that such action affected the terms or conditions of their employment. *See Hicks*, 593 F.3d at 164. To prove adverse employment action for purposes of a retaliation claim, plaintiff need only show that the "employer actions . . . would have been materially adverse to a reasonable employee or job applicant." *White,* 548 U.S. at 2405; *Hicks*, 593 F.3d at 164.

However, the Plaintiff has not asserted a retaliation claim. [Dkt. #25, Amended Complaint, Ex. 1, CHRO Complaint] (Plaintiff did not check the box indicating the intent to pursue a retaliation claim before the CHRO and she has therefore not obtained a right to sue letter for a retaliation claim).

Based on the foregoing analysis, Plaintiff has failed to establish that she sustained an adverse employment action under Title VII on the basis of race or color discrimination.  Plaintiff's required attendance at a fact-finding meeting does not constitute an adverse employment action. A disciplinary meeting, without any further consequence, is not a material change in the terms and conditions of employment. *See Gear,* 2011 WL 1362093 at *3. Moreover, even if the disciplinary letters which Plaintiff believes were placed in her personnel file were actually placed in her file, Plaintiff has not demonstrated that she has suffered any tangible harm as a result.  A disciplinary letter does not constitute adverse employment action in a Title VII discrimination claim without some tangible consequence, and Plaintiff admits she was never disciplined since her

reinstatement. *See* Cristofaro, WL 635263 at \*10; *Shabat*, 925 F. Supp. At 989;

O'Hazo, 599 F.Supp.2d. at 248, 258.

Lastly, to the extent that Plaintiff argues that the alleged extra trainings and special monitoring were adverse employment actions, they also fall short of the standard for materially adverse employment actions. As Plaintiff admits, retraining was a constant part of her employment, so extra training cannot be said to effect a material change in the terms and circumstances of her employment. [*See* Dkt. #43-1, Def. Rule 56 Stmt. ¶ 65]. Additionally, excessive monitoring does not constitute adverse employment action. *See Bennet*, 136 F.Supp.2d at 248.

### D.  Inference of Discrimination

Even assuming Plaintiff suffered an adverse employment action, she has failed to demonstrate that the circumstances surrounding the alleged adverse employment action gave rise to an inference of racial discrimination. A plaintiff may demonstrate such inference by showing that her employer treated her less favorably than similarly situated employees who are outside the plaintiff's protected class. *Desir v. City of New York*, No. 10–3815–cv, 2011 WL 5176178 at \*2 (2d Cir. November 02, 2011). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Id.* at \*2 (quoting *Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 493–94 (2d Cir.2010)).  Comparable conduct requires "a reasonably close resemblance of the facts and circumstances of

24

plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000).

Plaintiff alleges several instances in which she contends that similarly situated employees of different races who principally worked for different supervisors at different locations and having different titles received more favorable treatment. Although Defendant apparently does not contest that those employees were subject to the same evaluation and disciplinary standards, Defendant argues they were not engaged in comparable conduct.

Plaintiff alleges that three Caucasian employees at a DDS Transitional Unit in Meriden were similarly situated, having essentially the same employment responsibilities as Plaintiff, and received favorable treatment when they were not subjected to disciplinary action after their client died while under their supervision. [Dkt. #56-1, Pl. 56 Stmt. ¶¶ 51, 54; Dkt. #43-1, Def. Rule 56 Stmt. ¶ 51]. However, Plaintiff ignores several important distinctions. The Caucasian employees' client died of a heart attack as the result of a medical condition, whereas the client for whom Plaintiff was responsible died from choking on contraband. [Dkt. #43-1, Def. Rule 56 Stmt. ¶¶ 52, 53; Dkt. #43-1, Def. Rule 56 Stmt. ¶ 17]. Additionally, while Plaintiff, Granger, and Greene were terminated from employment based on a finding of neglect, the Meriden employees were investigated by an independent state agency that found no evidence of neglect. [Dkt. #43-1, Def. Rule 56 Stmt. ¶¶ 17, 53]. Although the finding of neglect on the part of Plaintiff and her colleagues was subsequently held unsubstantiated, the finding of neglect, which Plaintiff does not claim was in bad faith, existed at the

time the employees were terminated. The finding of neglect and the circumstances of the client's death make the character of Plaintiff's conduct sufficiently different from the conduct of the Meriden employees. [*See id.* at ¶ 18]. The Meriden employees are therefore not similarly situated to Plaintiff as there conduct was not of "comparable seriousness." *Graham*, 230 F.3d at 40. Moreover, Plaintiff claims she was harassed after she returned to work after her suspension following the choking incident.

Plaintiff presents several speculative and unsubstantiated allegations of similarly-situated employees receiving favorable treatment. Plaintiff argues that Hayes, a Caucasian employee who worked at the Wintergreen home under the same supervisor, was similarly situated to Plaintiff, yet treated more favorably when he was not disciplined after allegedly dispensing the wrong medication to a client. [Dkt. #43-1, Def. Rule 56 Stmt. ¶¶ 58–59]. However, Plaintiff does not have first-hand knowledge of whether Hayes was disciplined, and she has testified that she has not reviewed Hayes's file. [*Id.* at 59].  Plaintiff also alleges that several DDS employees at a group home in North Branford were not subjected to discipline after a client choked on bones and was hospitalized. [*Id.* at ¶ 55]. Other than the client's initials ("KG"), however, Plaintiff offers no further information about the incident. [Dkt. #56-1, Pl. 56 Stmt. ¶ 55]. Plaintiff further alleges that an employee at the North High Street facility, whom she identified as "Bill," was not disciplined even though for an entire day he did not give medications to the clients for whom he was responsible.  [*Id.* at ¶ 57]. Plaintiff's unsubstantiated conclusory allegations regarding Hayes, "KG" and "Bill" fall far short of the

standard for establishing an inference of discrimination on the basis of favorable treatment afforded to similarly-situated employees. *See Shumway v. United Parcel Service*, 118 F.3d 60, 65 (2d Cir. 1997) (holding that plaintiffs "conclusory statements of no probative value" regarding allegedly similarly situated employees were "unsupported by admissible evidence" and therefore did not raise a genuine issue of material fact).

The incidents that Plaintiff alleges occurred after her reinstatement also fail to demonstrate an inference of racial discrimination. With respect to the timesheet incident in which Plaintiff allegedly was subjected to harsher treatment than another employee with a similar timesheet discrepancy, Plaintiff fails to identify the race of this other employee. [Dkt. #56-1, Pl. 56 Stmt. ¶ 40]. Since Plaintiff has failed to establish that this employee was not in Plaintiff's protected class, she has failed to establish that a finder of fact could conclude that the employee is similarly situated and that Plaintiff was subjected to disparate treatment with respect to the timesheet incident.

All remaining incidents cited by Plaintiff also fail to give rise to an inference of racially-motivated mistreatment. With respect to these incidents, Plaintiff offers no evidence demonstrating that similarly-situated workers of different races received favorable treatment. In addition, such incidents lack any racial overtones, and although Plaintiff had several African-American colleagues, she offers no evidence that any of them were treated discriminatorily, and in fact, strives to distinguish her situation from even her African-American coworkers. [*See* Dkt. #43-1, Def. Rule 56 Stmt. ¶31 (admitting Brown, Miles, Granger, and

Greene are African-American without claiming they were treated discriminatorily); ¶4 (admitting Green is African American); ¶ 6 (admitting Worsley is African-American); Dkt. #60 Def.'s Supp. 56 Stmt. ¶ 100 (admitting McNair is African-American)]; *See* Dkt. #56-1, Pl. 56 Stmt. ¶¶ 22, 23 (arguing that African-American coworkers not required to attend training Plaintiff was required to attend)]. This further weakens her argument that her alleged disparate treatment was based on race.

Plaintiff alleges that Carmen Douglas, a Hispanic American and one of Plaintiff's supervisors, treated her discriminatorily when Douglas purchased meat with bones and gave it to Plaintiff to prepare for the clients, allegedly knowing the home only cooked boneless meat. [Pl. Depo., Exh. A, 94:12–25, 96:3–25, 97:1-9]. However this incident is wholly devoid of any racial overtones nor does Plaintiff offer evidence that other African-American employees suffered similar treatment, even though several of her colleagues were African-American. [*See id.*; Dkt. #43-1, Def. Rule 56 Stmt. ¶¶ 4, 6, 31; Dkt. #60 Def.'s Supp. 56 Stmt. ¶ 100]. This further undermines an inference that Plaintiff's treatment was racially motivated. *See Bernard v. JP Morgan Chase Bank NA*, 408 Fed.Appx. 465, 468–69 (2d. Cir. 2011) (holding that plaintiff failed prove inference of discrimination based on gender, noting that although half of employees with plaintiff's job title female, she offered no evidence of discrimination involving any of those female employees).

Allegations that DDS employee Brinton was hired to scrutinize Plaintiff's work also fail to give rise to an inference of racial discrimination. Although Brinton would generally make his visits on second shift, his Wintergreen Avenue

reports demonstrate that Plaintiff was present on only 3 of his 7 visits. [Dkt. #60 Def.'s Supp. 56 Stmt. ¶ 89 Dkt. #43-1; Def. Rule 56 Stmt. ¶¶ 46–47]. Additionally, Brinton visited homes other than the Wintergreen home on various occasions. [Dkt. #60 Def.'s Supp. 56 Stmt. ¶ 90; Exh. G, Attachment 17]. Plaintiff has offered no evidence therefore suggesting that Brinton was monitoring her in particular. Even if he was monitoring Plaintiff, there is no evidence demonstrating that the extra monitoring was motivated by her color or race.

Plaintiff also argues that she was singled out to participate in the December 7th in-service training, emphasizing that Granger and Greene, who are also African American, did not attend. Moreover, she argues that Brown and Miles were merely in attendance because it was their shift to work and they did not participate in the in-service training. [*See* Dkt. #56-1, Pl. 56 Stmt. ¶¶ 22, 23]. Plaintiff's efforts to distinguish her treatment from the treatment of other African-American employees undermines rather than supports her argument that she was treated differently on the basis of her race. Plaintiff's claim is further undermined by the fact that the in-training instructor was also African-American. [*See* Dkt. #43-1, Def. Rule 56 Stmt. ¶ 6].

Plaintiff maintains that she was treated discriminatorily when she was required to attend a fact-finding hearing for an alleged work rule violation. However, Plaintiff presents no evidence indicating a racial motivation nor does she identify any particular similarly-situated employees of other races who were treated more favorably. Accordingly, there is insufficient evidence to give rise to an inference of racial discrimination. *See Shumway*, 118 F.3d at 65.

Lastly, Plaintiff's assertion that harassing comments were made towards her contain no factual allegations to support an inference of racially-motivated bias. Plaintiff's allegation that Worsely accused Plaintiff in front of her coworkers of leaving a pot of bones on the stove contained no reference to any racial overtones or animus. [*See* Dkt. #43-1, Def. Rule 56 Stmt. ¶ 48; Dkt. #56-1, Pl. 56 Stmt. ¶ 48].  Plaintiff's allegation that D'Haiti, an African American male of Haitian ancestry, informed Plaintiff that McNair told him and others to make Plaintiff's "life as miserable and … as hard as possible, [and] to do anything [they] could to upset [her] shift, to upset [her]) is similarly devoid of any factual basis from which the Court could infer discriminatory intent. [Pl. Depo., Exh. A 123: 8–22]. Although D'Haiti's refutation of this allegation creates a factual dispute in the record, this dispute does not preclude the Court from granting summary judgment where the remarks, even when accepted as true, provide only "a 'scintilla' in light of their offhand, conclusory nature and the lack of further support in the record," for Plaintiff's assertion. *Fincher v. Depository Trust & Clearing Co.*, 604 F.3d 712, 727 (2d Cir. 2010) (accepting plaintiff's account of a conversation as true and holding that the "remarks do not provide an adequate evidentiary basis for the denial of the motion for summary judgment.") Accordingly, these conclusory allegations are insufficient to withstand summary judgment. *See Shumway*, 118 F.3d at 65.

### E.  Legitimate Non-Discriminatory Reason

Even if Plaintiff had successfully alleged her prima facie case, Defendant has offered legitimate, nondiscriminatory reasons for it actions. Once Defendant offers such reasons, the court may not engage in a credibility assessment.

Defendant's burden at this stage is one of production, not of persuasion. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).

Defendant has offered a legitimate non-discriminatory reason for requiring Plaintiff to attend the December 7th in-service training. Defendant contends that changes to clients' seating and dining guidelines had recently been made, requiring all staff to be retrained. Plaintiff admits that could not resume her duties following reinstatement until she received all necessary training. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 20, 24]. Therefore Plaintiff has conceded that as a necessary training, the Defendant's had a legitimate non-discriminatory reason for requiring her attendance.

Defendant has also offered a legitimate non-discriminatory reason for requiring Plaintiff to attend the training on December 12th which was ultimately cancelled. Defendant explains that the training was cancelled due to low registration and Plaintiff, as a late add-on to training, was not included on the roster and thus was not notified of the cancellation. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 28]. Defendant further contends that Plaintiff was paid for the time of the scheduled meeting. [Dkt. #60 Def.'s Supp. 56 Stmt. ¶ 100].

Regarding Plaintiff's allegation that Douglas purchased meat with bones for Plaintiff to prepare for the clients, allegedly knowing that the home served only boneless meat, Defendant explains that although many homes preferred to purchase boneless meat, there was no DDS policy requiring boneless meat. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 49]. Defendants allege that McNair explained this to

Plaintiff, and told her that he would speak to Douglas about it. [Dkt. #60 Def.'s Supp. 56 Stmt. ¶ 105].

Plaintiff also alleges that she was treated discriminatorily with respect to the alleged timesheet discrepancy. [Dkt. #56-1, Pl. 56 Stmt. ¶ 40]. However, Defendant indicates that the absence of Plaintiff's name on the sign-in sheet required clarification, and Defendant purports that it acted in good faith given the information available. [*Id.*]. Further, Defendant reports that once Defendant determined that there was no misrepresentation, Plaintiff's payroll was adjusted and no disciplinary action was instituted. [Green Aff. Exh. D, Attach. 11].

With respect to the investigatory meeting where Plaintiff was questioned regarding an alleged work rules violation, Defendant maintains that when it became aware of a complaint that Plaintiff violated a work rule, it had to investigate the allegation, as it does for all DDS employees. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 41].

As discussed earlier, in response to Plaintiff's claim that Brinton was hired to monitor her, Defendant explains that Brinton conducted periodic inspections on various group homes to ensure programs and practices were being implemented properly. [Dkt. #43-1, Def. Rule 56 Stmt. ¶¶ 46–47]. Although he did tend to visit the Wintergreen home on second shift, he did so only because this was the time most clients were home from their day programs. [Dkt. #60 Def.'s Supp. 56 Stmt. ¶ 89].

Plaintiff also claims that Worsley accused Plaintiff of leaving a pot of bones on the stove. [Dkt. #56-1, Pl. 56 Stmt. ¶ 48]. However, Defendant explains that

Worsely noticed a client who required line-of-sight supervision enter the kitchen and attempt to lift the lid of a boiling pot of food. She asked who was responsible for the client, out of concern for the client's safety. [Dkt. #43-1, Def. Rule 56 Stmt. ¶ 48].

### F.  Pretext

Assuming arguendo that Plaintiff was able to allege a materially adverse employment action, because the Defendant has sustained its burden of offering legitimate non-discriminatory reasons for the treatment, applying the burden shifting test set forth in *McDonnell Douglas,*  Plaintiff would be required to demonstrate that the Defendant's proffered reasons are pretextual.  *McDonnell*, 411 U.S. at 804. Pretext can be established "either directly by showing 'that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Johnson v. Conn.*, No. 3:10cv0175, 2011 WL 2947036, at *56 (D. Conn. July 20, 2011) (citing *Weiss v. JP Morgan Chase & Co.*, 332 F. App'x. 659, 661 (2d Cir. 2009)).

In order to rebut the Defendant's purported legitimate non-discriminatory reasons, it appears that Plaintiff relies on her prima facie evidence, arguing that since other employees of different races were not disciplined or required to attend fact-finding meetings, the real reason for Defendant's actions must be racial discrimination.

Based on the aforementioned reasoning, Plaintiff has failed to demonstrate an inference of discrimination, and therefore cannot rely on the same evidence to

establish that the Defendant's purported legitimate non-discriminatory reasons are mere pretext.

Accordingly, Plaintiff's disparate treatment claims fail to withstand summary judgment, as Plaintiff' allegations that she was singled-out to receive extra trainings and had unfavorable letters placed in her employment file do not constitute materially adverse employment actions. Further, Plaintiff has failed to set forth evidence to allow an inference of discrimination, or to establish that the Defendant's proffered legitimate non-discriminatory reasons were merely pretextual. Falling far short of the prima facie case required under *McDonnell Douglas*, summary judgment is granted as to Plaintiff's disparate treatment claim.

### G. Hostile Work Environment Claim

The thrust of the Plaintiff's complaint may well be a claim for hostile work environment on the basis of her race and color. This claim is also unavailing. Under Title VII, it is unlawful for an employer to subject an employee to a discriminatorily hostile work environment. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993). To prove her work environment was hostile, Plaintiff must show that "(1) she subjectively perceive[d] the environment to be abusive, (2) the conduct was so severe or pervasive that it created an objectively hostile or abusive work environment, meaning an environment that a reasonable person would find hostile or abusive, and (3) the conduct created an environment abusive to employees because of their race, gender, religion, or national origin." Plaintiff's work environment must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21–22.

There is no precise test to determine whether Plaintiff's workplace is sufficiently hostile. Rather, the court must take into account the totality of the circumstances, which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23; *Williams v. Westchester*, 171 F.3d 98, 100 (2d Cir. 1999) (citing *Harris*, 510 U.S. at 23). The court must view all factors cumulatively, evaluating the quantity, frequency, and severity of discriminatory incidents. *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997).

Although Plaintiff may use incidents that are facially race-neutral, she must demonstrate a basis from which a reasonable fact finder could infer that those neutral incidents were in fact racially motivated. *Alfano v. Costello*, 294 F.3d 365, 375, 377 (2d. Cir. 2002). As the Second Circuit has cautioned, "[e]veryone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." *Id.* at 377.

Even assuming Plaintiff's factual allegations to be true, Plaintiff has not sustained her burden to establish a hostile work environment. Assuming Plaintiff meets the subjective element of the test, she clearly has failed to demonstrate

that her workplace was sufficiently severe and that it created an environment that was abusive on the basis of race.

Plaintiff has failed to demonstrate that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." [*Harris*, 510 U.S. at 21–22]. According to the parties' Local Rule 56 statements, Plaintiff alleges eight incidents that she believes were racially discriminatory, occurring over a period of approximately three and a half years. [Dkt. #56-1, Pl. 56 Stmt. ¶ 22 (December 7th In-Service); ¶ 28 (December 12th Training); ¶ 49 (Meat With Bones Incident); ¶ 40 (Timesheet Incident); Pl. Depo., Exh. A 160: 13–23 (Work Rules Incident); Dkt. #43-1, Def. Rule 56 Stmt. ¶¶ 46–47 (Inspection Incident); Dkt. #56-1, Pl. 56 Stmt. ¶ 48 (Comments by Worlsey); Pl. Depo., Exh. A 123: 8–22 (Comments by D'Haiti)]. Other than the December 7th and December 12th trainings, which occurred in the same month, the closest gap between incidents was over five months. These incidents were not sufficiently pervasive to create a hostile work environment. *See Miller v. Praxair, Inc.*, 408 Fed.Appx. 408, 411 (2d Cir. 2010) ("for a hostile work environment to exist, the offending 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' ") (citing *Alfano*, 294 F.3d at 374); *see also Shabat v. Blue Cross Blue Shield of Rochester*, 925 F. Supp. 977, 983 (W.D.N.Y. 1996) (holding that incidents could hardly "permeate" plaintiff's workplace where they were far from regular occurrences, most of them separated by a month or more); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d

343, 354 (5th Circuit 2001) (holding that eight incidents of racial harassment over a twenty-five month period were not sufficiently severe or pervasive to create a hostile work environment).

Moreover, Plaintiff has failed to prove that the alleged events occurring since her reinstatement were sufficiently pervasive as to interfere with her work performance. She admits that she has not been disciplined since her reinstatement, and the evidence shows that Plaintiff received "good" performance reviews on each of her Performance Appraisals from September 2007, 2008, and 2009. [Dkt. #43-1, Def. Rule 56 Stmt. ¶¶42–44; Dkt. #60 Def.'s Supp. 56 Stmt.  ¶¶ 85–86]. Evidence that the terms and conditions of her employment remained the same, that she was not subject to discipline, and that she in fact received favorable evaluations throughout the time period in question further demonstrates that Plaintiff's work environment was not sufficiently abusive to support her hostile work environment claim. *See Cristofaro v. Lake Shore Central School District*, No. 06-CV-0487S, 2011 WL 635263 at *7 (W.D.N.Y. Feb. 11, 2011) (holding that plaintiff had not demonstrated that the alleged harassment interfered with her work performance given that the terms and conditions of her employment remained the same, given that she was never disciplined, demoted, or terminated, and given that she received positive reviews from her superior).

As to the third requirement, that the conduct created an environment abusive to employees because of their race, since Plaintiff alleges incidents that are facially race-neutral, she must offer additional evidence demonstrating those

actions actually were discriminatory. *Alfano*, 294 F.3d at 377; *Chacko v. Connecticut*, No. 3:07cv1120(CFD), 2010 WL 1330861 at *10 (D. Conn. Mar. 30, 2010). She could demonstrate this, for instance, by showing that the neutral incidents were part of a course of conduct that included both discriminatory and nondiscriminatory conduct. *See Alfano*, 294 F.3d at 375. However, all incidents cited by Plaintiff are facially race-neutral, and even when viewed together, they do not give rise to an inference of racial discrimination. As discussed with respect to her disparate treatment claim, Plaintiff has failed to demonstrate that similarly situated employees of different races were treated more favorably than she was. Even if Plaintiff has proven that Defendant indeed treated her unfavorably since her reinstatement, absent a link to racial discrimination, Plaintiff has failed to establish that she was subjected to a hostile work environment. *See Chacko*, 2010 WL 1330861 at *11; *Alfano*, 294 F.3d at 377, 378. While the Court is aware that racism is often nuanced, here, the Plaintiff cites no indicia of racial animus from which a reasonable finder of fact could find discrimination based on race or color. Accordingly, the Plaintiff has failed to establish a material factual dispute as to her hostile work environment claim.

> H.  Intentional Infliction of Emotional Distress

Lastly, Plaintiff alleges that Defendant DDS's conduct was sufficiently extreme and outrageous as to demonstrate the intentional infliction of emotional distress. Under Connecticut law, a plaintiff seeking to establish intentional infliction of emotional distress must show: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that the emotional

distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the distress suffered by the plaintiff was severe." *Appleton v. Bd. Of Ed. Of the Town of Stonington*, 254 Conn. 205, 210 (2000)(citation omitted). "Whether the defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. Only where reasonable minds disagree does it become an issue for the jury." *Id.* (citation omitted).

"In the employment context, it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous. An employer's adverse yet routine employment action does not constitute extreme and outrageous conduct even if based on race or other improper motives." *Robinson v. City of New Haven*, 578 F. Supp. 2d 385, 390 (D. Conn. 2008) (internal quotation marks and citations omitted). "Routine employment action, even if undertaken with improper motivations, does not constitute extreme or outrageous behavior when the employer does not conduct that action in an egregious and oppressive manner." *Conge v. Sikorsky Aircraft Corp.*, No.3:075-cv-1650, 2007 WL 4365676, at *9 (D. Conn. Dec. 11, 2007). As previously discussed, the actions taken by Defendant DDS towards Plaintiff were routine. Plaintiff admits that the trainings she was required to attend were consistent with DDS policy regarding reinstated employees. Further, all other allegations of disparate treatment, including a fact-finding hearing regarding an alleged work rule violation, letters placed in Plaintiff's employment file, and disparaging comments made by fellow employees

39

fail to provide any facts to permit an inference of discrimination and thus fall far short of let establishing discrimination of such a caliber as to constitute extreme or outrageous conduct. *See Lorenzi v. Connecticut Judicial Branch*, 620 F.Supp.2d 348, 353 (D.Conn. 2009) ("Close supervision, the demeaning and unprofessional speech alleged . . . unfair job appraisals, inferior office space, denial of pay raises and promotions, orders to limit interactions with certain other employees, insults about one's lunch, discrimination on the basis of race and/or national origin . . . do not meet the standard for finding that conduct was extreme and outrageous.").

Accordingly, where no reasonable jury could find that DDS subjected Plaintiff to extreme and outrageous conduct, summary judgment is granted as to Plaintiff's claim of intentional infliction of emotional distress.


IV.    Conclusion

Based upon the above reasoning, the Defendant's [Doc. #46] motion for summary judgment is GRANTED and all of Plaintiff's claims have been accordingly dismissed.


IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 14, 2012